**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**SHANE DIXON**                                                                                    **PLAINTIFF**


**v.**                              **CASE NO. 4:07-CV-00084 GTE**


**ARKANSAS SURGICAL HOSPITAL, LLC**                                      **DEFENDANT**


**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Presently before the Court is Defendant's Motion for Summary Judgment.

**I.      FACTS**

Arkansas Surgical Hospital (the "Hospital") is a physician-owned, speciality hospital

offering surgical services to its patients in four areas: orthopedics, spine, cosmetic/reconstruction

and pain management.  In May 2005, Plaintiff applied for employment with the Hospital for a

position he called "Medical Records/Admissions."  Plaintiff signed the employment application

with the Hospital under the heading "Please Read Carefully" (in bold language), which states:

> This Application for Employment is not a contract and cannot create a contract.  If
> employed by the hospital, I agree to abi[d]e by its rules and regulations.  I
> understand that my employment would be "at-will" and could be terminated at
> any time by either party, with or without cause and with or without notice.  This
> understanding supersedes all prior agreements and representations, and any
> subsequent understanding which affects this arrangement must be in writing and
> signed by the Chief Executive Officer of the hospital.

Plaintiff understood the Application for Employment to mean that he was an at-will employee,

and that he understood that term to mean that they could have just fired him and not given him

any explanation.

1

Plaintiff was not aware of any employment contract that he had with the Hospital.  He states that his breach of contract claim is based upon a Hospital policy manual.  Plaintiff stated that "the fact that [he] was given a handbook and was hired, that is a form of contract.  When asked if he ever read the employee handbook, Plaintiff testified that he "laughed and closed it" after noticing certain typos referring to another hospital upon which Arkansas Surgical Hospital's manual was based, but that he has read it since his employment was terminated.

Plaintiff signed the Arkansas Surgical Hospital "Information Confidentiality, Privacy and Security Employee [A]ccountability [A]greement" dated June 21, 2005.  Plaintiff admits that he retained certain Hospital documents pertaining to patients after he left the Hospital.  When asked whether he had "any opinion as to whether [him] keeping documents like this would violate the confidentiality policy[,]" Plaintiff answered "yes" he had an opinion and "yes" it violated the policy, "to an extent[.]" Plaintiff also admits to taking a copy of the Hospital employee handbook home and never returning it after he was terminated.

On July 6, 2005, Plaintiff signed a health insurance application with Arkansas Blue Cross and Blue Shield, which provides:

> I understand that . . . NO BENEFITS WILL BE AVAILABLE DURING THE APPLICABLE PRE-EXISTING CONDITION EXCLUSION PERIOD FOR TREATMENT OF ANY CONDITION FOR WHICH A COVERED PERSON RECEIVED MEDICAL ADVICE, DIAGNOSIS, CARE OR TREATMENT WITHIN THE SIX (6) MONTH PERIOD ENDING ON THE EFFECTIVE DATE OR THE FIRST DAY OF THE WAITING PERIOD, WHICHEVER IS EARLIER.
>
> In signing this application, I represent that the statements and answers given in this application are true, complete and correctly recorded.

Plaintiff admits that he read all of the questions on the application when answering them, studied contracts in an 18 months legal assistant/paralegal course, and would "deal with insurance and things in the course of his duties at the hospitals" where he had previously worked.  However, Plaintiff answered "No" as to Question 3.e, which inquires, "In the past 10 years, has any person to be insured ever had or been advised to have treatment, diagnosis or care for: . . . Anxiety, panic attack, depression, mental disease, nervous disorder, eating disorder, or attempted suicide?".  Plaintiff had been seeing a psychiatrist since November of 2004.  Plaintiff attempted to "explain" his "No" answer by stating that "I don't know where it's going, and I don't know who is seeing it[,]" "as soon as somebody sees that, that's in their mind[,]" "why do most people not say they have HIV, because they don't want to be prejudged," "I don't want to lose my source of income over something like–or be denied insurance over something like . . . this[.]"  Plaintiff stated that he answered as he did because he "didn't know where the application was going, who was going to see it, and at this point he had not developed a level of trust in anybody and the way things had been run so far."

Plaintiff also answered "No" as to Question 3.p, which provides "In the past 10 years, has any person to be insured ever had or been advised to have treatment, diagnosis or care for: . . . Any physical or mental problem, condition or disease NOT listed above?".  Plaintiff testified that he answered as he did because up until he "applied for [S]ocial Security [disability benefits], [he] never asked [his] doctor what [his] diagnosis was, so [he] couldn't very easily put down there bipolar, schizophrenic, what–[he] didn't know."  Plaintiff stated that he did not even ask his doctor for his diagnosis until August or September of 2006, after his employment was terminated from the Hospital.

3

Similarly, Plaintiff answered "No" to Question 5, which provides, "Has any person to be insured ever been to see, or been advised to see a . . . psychiatrist . . . or other health care provider within the past 10 years?".  Plaintiff explained that "as far as Dr. Remmel is–he is my everything doctor.  Really, I mean, I don't have a quote, primary.  If I'm sick or whatever, I can call him, and he will prescribe me, you know, the three day flu or whatever.  He's my doctor.  I don't see him as a psychiatrist; I see him as my doctor.  So that's probably what, you know, was going through my mind on that."

Plaintiff also answered "No" as to Question 10 which provides, "Has any person to be insured been prescribed or taken any prescription medication for more than a total of 30 days in the past 2 years?  If "yes" list full details below. (Use separate sheet if necessary, Sign, date and attach to this Application.)."  However, Plaintiff had been prescribed many drugs by his psychiatrist such as Ambien, Symbyax, Eskalith, Seroquel, Prozac, Zyprexia, Resteril, and Halcion.  Plaintiff explained that "at that point in time, we had been–every month or whatever I went to the–I had went to see Dr. Remmel.  Yes, he prescribed me medication, but it had different effects, but it was not consistent.  So there had not been one pill that I had been consistently taking . . .."  Plaintiff stated that he thought the question meant whether he had taken a particular medication for the requested time period.

Plaintiff denies that Ms. Bibbs assisted him in filling out the application.  Plaintiff testified that he is "not denying that I filled out the insurance forms wrong"– he attributes it to "part me" and "part . . . social stigma."  Plaintiff also claimed that the Hospital is at fault for these misstatements of fact and omissions of fact.

4

To the best of his recollection, Plaintiff's first day of actual work at the Hospital was the "second Thursday following the 3rd of June, 2005."  The job description for an "Admission Clerk" at Arkansas Surgical Hospital, which Plaintiff states was given to him by a former coworker around that coworker's departure in December of 2005, states, "**THE JOB DESCRIPTION IS NOT INTENDED TO BE AN EMPLOYMENT CONTRACT, NO DOES IT DISSOLVE THE 'AT WILL' EMPLOYMENT RELATIONSHIP.**" Plaintiff admits that the job description accurately states the "essential job functions" of the position, but claims that as a practical matter all of them can only be performed by multiple people.

Plaintiff initially "loved" his job, claimed to be good at it, and confided to his psychiatrist that it was "a good job," that it "paid well," and while he felt overworked, "he felt that he was treated with respect."  A few months after his employment began, in September of 2005, Plaintiff felt that his job was keeping him busy because they were starting to see more and more people, but he was feeling more comfortable with it.  The Hospital had another employee trained and assisting Plaintiff, which helped.  Plaintiff was "trying to put a positive spin on it" because everyone was telling him to hang in there.

During the week of Thanksgiving in November 2005, Plaintiff's co-worker was off. Despite the fact that the Hospital had brought in Plaintiff's friend, Tammy Williams, to fill in, Plaintiff had just "had enough" and "was tired of hearing it's going to get better."  Plaintiff claims that he "wasn't seeing any improvement," so he typed up his resignation, asked to see Mr. Miller, told him he "was done," and laid the envelope on the table on Monday of that week. Plaintiff and Mr. Miller talked for about an hour about Plaintiff's concerns, and Mr. Miller asked Plaintiff to hold onto the envelope as he would talk to people above him regarding the matter.

5

Plaintiff stated that Mr. Miller told him that "everybody loves and respects [him] so much" and that they needed him, so Plaintiff put the envelope back in his pocket and went back to his desk. Plaintiff stated that "there had been a change made that [] hurt the department . . . and it was kind of the final straw."  Plaintiff told the administration that in his opinion, the change did not "make a lick of sense," and when Mr. Miller responded that Plaintiff had to learn "to accept change," Plaintiff stated that he was "not trying to be a rebel."  At that point, Plaintiff was "fed up" and "just ready to get out of there."  Plaintiff referred to this incident as a "meltdown at work." However, the Hospital's administration requested that Plaintiff stay (which he did), and, according to Plaintiff, informed him that there would be changes being made that were going to make everyone happy.

Plaintiff testified that he began to dislike his job "the day he was called into the office and . . . accused of threatening an employee and cutting himself and was sent home."  On December 19, 2005, a meeting took place wherein Plaintiff was placed on suspension in order to investigate alleged threats and inappropriate behavior (emotional, verbal and physical outbursts) engaged in by him that occurred during the week of December 12 through 16, 2005.  Tina Albright, the HR Manager, drafted a suspension notice, which was signed by Plaintiff, Ms. Albright, and Mr. Miller.  Plaintiff did not say one way or the other as to whether he had any criticisms of the manner in which the Hospital's investigation took place because he did not know how they investigated or how it was handled.  Plaintiff admits that fellow employees had expressed concern about his actions, including, but not limited to the fact that they believed he would eventually "snap and hurt someone," that he was cursing at employees, that he was throwing things, that he was engaging in emotional outbursts, that he had stated on multiple occasions that

he was going to "kill someone," and that he was cutting himself to make himself bleed.  Plaintiff

claims that he never cut himself on purpose, and instead perhaps did so accidentally.

Plaintiff was reinstated from the suspension as of December 22, 2005, after an

investigation took place and the following was determined, as set forth in a letter dated

December 21, 2005:

1)      You did not make any threats to anyone in your department.

2)      You were in violation of Arkansas Surgical Hospital HR Policy HR
        1.9(1E)– "Types of behavior and conduct that the hospital considered
        inappropriate include but are not limited to the following: . . . (E) Fighting
        or using obscene, abusive or threatening language or gestures."
        Additionally, you are subject to HR Policy HR 1.9(2)–"Should
        performance, conduct, work habits, overall attitude, or demeanor become
        unsatisfactory in the judgment of the hospital, based on violations either of
        the above or of any other hospital rules, policies or regulations, employee
        will be subject to disciplinary action, up to and including discharge."

3)      You have been exhibiting behaviors that are inappropriate for this work
        environment, including throwing things, emotional outbursts, and seeking
        to make yourself "bleed" by cutting yourself.  This is unacceptable and
        will not be tolerated by Arkansas Surgical Hospital.

4)      You are required to contact the Employee Assistance Program to seek help
        in changing your work behavior.

In order for you to return to work on Thursday, December 22, 2005 you must
understand that any instance of unacceptable behavior will result in your
immediate termination from Arkansas Surgical Hospital.  This is the only written
warning you will receive and it will remain in place for six months.  At that time
we will retain it as part of your file, however, we will evaluate your change in
behavior.

Plaintiff struck through the word "bleed" and wrote "did not happen."  When asked why he had

made that notation, but did not also cross out findings like "throwing things" and "emotional

outbursts," Plaintiff claims that Ms. Albright "said you have only got room right there, and that was all I could write there . . .."  Plaintiff denies these findings.

When asked whether he had ever told anyone at the Hospital about the voices that he was hearing, Plaintiff stated, "[a]fter the incident where I was suspended . . ., Ms. Albright, the HR director, wanted me to go to counseling.  And that's when I reluctantly came clean and told her that I was seeing a doctor."  Plaintiff states that only two other people at the Hospital knew that he "went to a psychiatrist"–Tammy and Denise. Ms. Albright wrote what Plaintiff told her on the bottom of the sheet, as follows: "Shane has spoken to his psy. re: diagnosis of manic/depressive-borderline schizophrenic in Sept. and possible need to reduce work hours."  Ms. Albright also wrote "not @ this time due to prev. appt" next to line 4. Plaintiff states that he did not contact the Hospital's EAP because of their connection with the Hospital, but that he could talk to his doctor who was independent or separated from the Hospital.  When Ms. Albright asked what was going on, Plaintiff stated that "we were understaffed," and Ms. Albright said that "maybe we should . . . cut you down to 35 or 32 hours for a month or so and see how it goes."  Plaintiff's hours were not reduced, and shortly thereafter, Denise quit, resulting in Plaintiff working by himself. Plaintiff admits that he did not bring the subject of the reduction of work hours up again, and the Hospital did not come to him about it.

Plaintiff worked at the Hospital for less than one year.  Plaintiff admits that regular and punctual attendance is an essential function of every job at the Hospital.  Plaintiff claims that he was "never written up for missing a day" and that he "had moments that [he] could not be at work due to personal issues, family issues" as his "family was going through a really tough time at that period of time[.]" While employed at the Hospital, Plaintiff was never denied time off.

8

On February 16, 2006, Ms. Albright received notice from Ms. Achten, Plaintiff's supervisor, that he had not been feeling well and that his doctor had purportedly ordered some blood work and tests to determine what was wrong.  However, Ms. Achten arrived at work at 7:00 a.m. that morning and Plaintiff was already gone.  Plaintiff was informed, once again, that he could not merely leave e-mail messages when he needed to leave, but rather that he should talk to Ms. Achten in person.

Plaintiff admits that it would be difficult for him to show up at work at 8:00 on Monday, have a consistent work week, go home on Friday, be ready to recharge and start the next week up.  Plaintiff admits that for a job where regular attendance at some site is necessary, it would be a difficult for him to engage in that type of work.  Dr. Remmel confirmed, and Plaintiff admits, that it is "common for people who have bipolar disorder . . . to be unable to maintain steady employment . . . , " and the same is true for people with paranoid schizophrenia.

Later, Plaintiff learned that his Uncle Harold, with whom his mother had had a "terrible falling out," was to have a procedure at the Hospital, which made Plaintiff anxious because he did not want to see his uncle.  Plaintiff believes that subsequently his uncle sent an anonymous letter to the Hospital complaining about him.  Plaintiff was "very angry" during this period of time and "very stressed" because he claims that the Hospital "hired someone to sit and watch him all of this time."  Plaintiff spoke with his physician about being "frustrated" at the Hospital.

On May 18, 2006, a recurring patient met with Gary Hooker, Chief Financial Officer, about how rudely she was treated by Plaintiff when he registered her for treatments.  However, Plaintiff denies that he treated any patient rudely.  Plaintiff admits that on May 19, 2006, at least one of his patients was "overlooked."  He states that after it was brought to his attention, he

9

slapped the wall when he walked by and that employees of the Hospital, patients and family members of patients may have witnessed the event.  Plaintiff talked to Ms. Achten and another person "about the wall slapping," but claims that "[t]he only thing that was mutually agreed on by all three of us was that it could have been handled better by all of us . . .."

Shortly thereafter, Plaintiff asked his physician to contact Tina Albright to give him some days off.  Around May 25, 2006, Plaintiff's physician, Dr. Remmel, called someone on the phone to request time off for Plaintiff.  Also, a letter dated May 25, 2006, addressed to Ms. Albright from Dr. Remmel, with a fax cover sheet marked "Confidential" states:

> Shane Dixon has been under my care since November 2004.  Shane will be unable to attend work from May 25, 2006 through May 31, 2006 because of personal reasons of which I am well aware.

A letter dated May 31, 2006, addressed to Ms. Albright from Dr. Remmel stated:

> Shane Dixon has been under my care since November 2004.  Shane will be unable to attend work from May 25, 2006 through June 5, 2006 because of personal reasons of which I am well aware.

Neither the fax cover sheet, nor the letters, identify Dr. Remmel as a psychiatrist.

After less than one year of employment, on June 5, 2006, at 4:45 a.m., the Hospital terminated Plaintiff's employment. The Disciplinary Action Notice states that the reason for the termination was "[u]nacceptable [b]ehavior, [a]ttitude and [r]efusal to check in patients." Plaintiff contends that the decision to terminate him was reached prior to his arrival at the meeting.  Although Plaintiff signed the termination form and paragraph 6 as entitled "Employee Comments", Plaintiff claims that he was not offered an opportunity to give or write any comments.  Ms. Albright's signature was not on the employee termination notice.

10

Plaintiff admits that at the time of his termination, it had gotten to the point that he "was going to go in, . . . explain to them what he had done, show them his resume and everything and say, . . . obviously we are both not happy.  If you are happy with the course that she's on, . . . I will work my two weeks, or I'll leave right now."  Plaintiff states that "all the Hospital had to do was call him and say things were not working out, we appreciate all you have done, but we are letting you go."

On the same day, Faye Nipps (the Hospital's then COO) found an e-mail on her computer from Mr. Dixon that was sent at 4:41 a.m. stating:

> According to the ASH Handbook Policy # HR 1.2 I need to notify you in writing of having a medical condition or disability that may affect the employee's ability to perform essential functions of the job.  I have been treated for Bipolar/Manic Depressive Disorder since November of 2004.  The Americans with Disabilities Act says I may request a "reasonable accommodation".  I have researched the law and one of the reasonable accommodations I am entitled to ask for is an adjustment in supervisory methods.  It is documented in my personnel file about my condition.  Let me know what you need from my doctor and we can go forward from there.  Thank you so much for your time in this matter.  I will also put a hard copy of this request in your mailbox in the administration office.

Plaintiff admits that this could be considered a self-diagnosis "basically from the medicines [he] was taking[,]" and that prior to this time he had not specifically asked for his diagnosis.  Plaintiff admits that it appears that his physician stated that Plaintiff was not bipolar.  Plaintiff also admits that his ADA request for a reasonable accommodation was his "back-up[.]"  He also represented to the EEOC that up until the point that his employment at the Hospital was terminated, the Hospital had nothing from his physician saying he was bipolar and manic depressive.

On June 5, 2006 at 4:26 p.m., Faye Nipps forwarded Plaintiff's e-mail to Tina Albright, Gary Hooker, Lynn Weeks, and Glenda Achten stating, "I just opened this email.  I had Lynn

11

come into my office and open it with me since I was told at 9:30 am that Shane had been terminated.  Please advise."  Plaintiff admits that Ms. Nipps did not have the opportunity to see and read the e-mail containing his request before his termination.

Regarding Plaintiff's allegations of defamation, Plaintiff states that the "false statements" made against him included statements about him threatening a coworker, cutting himself, being rude to people, punching walls, unacceptable behavior, and foul language.  Plaintiff does not know who reported him.  However, Plaintiff states that only a select few of the Hospital representatives knew of the events for which he was suspended.  When asked about publication of the statements to third parties, Plaintiff stated that "[o]nce it was on paper I don't know who saw it.  Anybody in that hospital could have saw it."  Plaintiff also stated that many of the statements would be published to "[e]verybody in administration on a need-to-know basis."  Plaintiff states that his reputation is ruined within the medical community.  However, Plaintiff has not gone out and tried to find additional employment with the medical community in Little Rock.

On June 29, 2006, Plaintiff filed his EEOC complaint alleging disability discrimination. In Dr. Remmel's opinion, Plaintiff became totally disabled on July 26, 2006.  On September 13, 2006, Dr. Remmel sent a letter in support of Plaintiff's application for Social Security disability benefits, which states:

Shane Dixon is a 29 year old white male with the following diagnosis:

Axis I chronic paranoid schizophrenia, recurrent major depression severe
Axis II none
Axis III non active
Axis IV severe, loss of job, social isolation, family stressors
Axis V current GAF is 35, highest GAF in past year is 65

. . .
It is my clinical opinion that Mr. Dixon is totally disabled at this time.  I will
continue to work closely with him to find just the right medications to control his
significant psychotic symptoms all the while minimizing the devastating side
effects from these kinds of psychotropics.  Mr. Dixon's prognosis for recovery is
poor and the only hopeful note is that it would appear that he was treated early in
the course of this disease and if we reach some level of stabilization we may be
able to avoid a spiraling course. . . .

Plaintiff was awarded Social Security disability benefits by letter dated October 16, 2006.

On February 12, 2007, Plaintiff filed his Complaint.  On September 28, 2007, Defendant

filed its Answer and Counterclaims against Plaintiff.  However, Defendant states that if summary

judgment is granted in its favor, there may no longer be federal jurisdiction.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the

dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.

1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in

determining whether this standard has been met:

The inquiry performed is the threshold inquiry of determining whether there is a
need for trial-- whether, in other words, there are genuine factual issues that
properly can be resolved only by a finder of fact because they may reasonably be
resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary

judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

[T]he burden on the party moving for summary judgment is only to demonstrate,
i.e., '[to] point[] out to the District Court,'that the record does not disclose a
genuine dispute on a material fact.  It is enough for the movant to bring up the fact

13

> that the record does not contain such an issue and to identify that part of the
> record which bears out his assertion.  Once this is done, his burden is discharged,
> and, if the record in fact bears out the claim that no genuine dispute exists on any
> material fact, it is then the respondent's burden to set forth affirmative evidence,
> specific facts, showing that there is a genuine dispute on that issue.  If the
> respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th

Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record] . . .

which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  However, the moving party is not required to support its

motion with affidavits or other similar materials negating the opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute

on a material fact, the non-moving party may not rest upon the mere allegations or denials of his

pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth

specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The plain

language of Rule 56(c) mandates the entry of summary judgment against a non-moving party

which, after adequate time for discovery, fails to make a showing sufficient to establish the

existence of an element essential to its case, and on which that party will bear the burden of proof

at trial.  *Celotex Corp.*, 477 U.S. at 322.

## III.    MOTION FOR SUMMARY JUDGMENT

In his Complaint, Plaintiff alleges the following claims: Count 1 - Disability

Discrimination in Violation of the Americans with Disabilities Act of 1990 ("ADA"); Count 2 -

14

Intentional Infliction of Emotional Distress; Count 3 - Breach of Contract; Count 4 - Violation of

the Family Medical Leave Act ("FMLA"); Count 5 - Disability Discrimination in Violation of

the Arkansas Civil Rights Act of 1993; Count 6 - Defamation; and Count 7 - Punitive Damages.

Defendant moves for summary judgment as to each of these claims in the motion presently

before the Court.

> **A.      Disability Discrimination**

Plaintiff alleges disability discrimination in violation of the Americans with Disabilities

Act of 1990 ("ADA") and the Arkansas Civil Rights Act of 1993 ("ACRA").  Courts "analyze a

disability claim presented under the ACRA using the same principles employed in analyzing

claims under the Americans with Disabilities Act . . . ."  *Duty v. Norton-Alcoa Proppants*, 293

F.3d 481, 490 (8th Cir. 2002).[1]

The ADA prohibits discrimination "against a qualified individual with a disability

because of the disability of such individual."  *Thompson v. Bi-State Development Agency*, 463

F.3d 821, 824 (8th Cir. 2006) (citing 42 U.S.C. § 12112(a); *Brunko v. Mercy Hosp.,* 260 F.3d

939, 941 (8th Cir.2001)).  Absent direct evidence of discrimination, the Court must apply the

*McDonnell Douglas*[2] three-part burden-shifting analysis to Plaintiff's claim.  *Id.* at 824-25 (citing

*Baucom v. Holiday Cos.,* 428 F.3d 764, 766 (8th Cir. 2005)).  Under this burden-shifting

framework, the Court must first determine whether Plaintiff has presented a prima facie case of

---

[1]However, the Court notes that the ACRA contains "no express provision for a cause of action for one who is simply 'regarded as' having a disability by others."  *Faulkner v. Arkansas Children's Hospital*, 347 Ark. 941, 953, 69 S.W.3d 393, 401 (2002).

[2]*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

discrimination; next, whether the Defendant rebutted the prima facie case by articulating a

legitimate, non-discriminatory reason for the action it took; and finally, whether Plaintiff met his

burden to prove Defendant's proffered justification was merely a pretext for discrimination. *Id.* at

825.

In order to establish a prima facie case of discrimination under the ADA, Plaintiff is

required to show that 1) he is disabled within the meaning of the ADA; 2) he is qualified to

perform the essential functions of the job, with or without accommodation; and 3) he has

suffered an adverse employment action due to his disability.  *Thompson*, 463 F.3d at 825.

Defendant argues that Plaintiff cannot establish that his termination was because of his

disability.  Rather, Defendant contends that the record demonstrates that Plaintiff was terminated

because of the Hospital's findings that Plaintiff made serious mistakes on the job (overlooking

two patients scheduled for surgery), hit the wall in the registration/admissions area in front of

Hospital employees, patients and family members, and refused to check in patients.  Defendant

notes that Plaintiff admits to overlooking at least one patient and slapping the wall.  Defendant

asserts that such incidents created disruptions in the surgery schedule, caused inconveniences and

increased stress to already-nervous surgical patients, and created potential liability for the

Hospital (i.e. although there are procedures in place to ensure that the correct patient is being

operated upon, one very important procedure relates to strict adherence to the surgery schedule

for patients).

Additionally, Defendant states that at the time of his termination, Plaintiff was on six

month probationary status due to the December 2005 incidents wherein he was found to have

engaged in inappropriate behavior and conduct, including but not limited to cursing in the

workplace, throwing things, and emotional outbursts.  Defendant also states that Plaintiff had

been told that it was the only written warning he would received, and any further instance of

unacceptable behavior would necessarily result in his immediate termination.  Plaintiff has not

directly addressed Defendant's assertions with regard to this causation element of the prima facie

case.

The Court agrees with Defendant that Plaintiff has failed to establish that he was

terminated "because of" his disability.  Additionally, Plaintiff has failed to provide any

explanation, much less a sufficient explanation, to reconcile the inconsistency between his ADA

claim that he is "otherwise qualified" for the position at issue and his Social Security disability

benefits claim that he is "totally disabled."  *Cleveland v. Policy Management Systems Corp.*, 526

U.S. 795, 806, 119 S. Ct. 1597, 1603 (1999) ("[W]e hold that an ADA plaintiff cannot simply

ignore the apparent contradiction that arises out of the earlier SSDI total disability claim.  Rather

[he] must proffer a sufficient explanation.").[3]  Therefore, summary judgment is appropriate as to

Plaintiff's ADA and ACRA claims.

**B.      Intentional Infliction of Emotional Distress**

In *Island v. Buena Vista Resort*, 352 Ark. 548, 565, 103 S.W.3d 671, 680-81 (2003), the

Arkansas Supreme Court stated:

> We have recognized a cause of action for the tort of outrage in an employment
> setting. *See M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980).

---

[3]Because the Court finds that Plaintiff failed to establish the third element of a prima facie
case, the Court need not address Defendant's alternative arguments.

We have explained that liability [for the tort of outrage] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Palmer, supra.* (*Citing the Restatement (Second) of Torts* § 46 Cmt. d (1965)).

There are four elements that are necessary to establish liability for the tort of outrage: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Faulkner v. Arkansas Children's Hosp.,* 347 Ark. 941, 69 S.W.3d 393 (2002).

Defendant argues that the record in this case is insufficient to support a prima facie case for the tort of outrage.  Plaintiff fails to address Defendant's arguments for summary judgment as to this cause of action.  The Court finds that summary judgment is appropriate as to Plaintiff's outrage claim.

### C.       Breach of Contract

Defendant argues that Plaintiff was aware and understood that he had no contract of employment with the Hospital and was an at-will employee.  Defendant states that in Plaintiff's deposition, he attempted to explain that his breach of contract claim was based upon the Hospital policy manual.  Defendant contends that Plaintiff has not established an enforceable contract between him and the Hospital, much less the breach of any contract.

Plaintiff argues that Plaintiff's breach of contract claim meets a recognized exception to the employment-at-will doctrine– violation of the general public policy of the State of Arkansas. Plaintiff points to various Hospital policies that he claims were not followed by the Hospital. Plaintiff asserts that Defendant's failure to follow its own policies with regards to staffing,

performance appraisals, ADA reasonable accommodations and competency of staff, exacerbated Plaintiff's disability to the point where he could no longer work for Defendant.  Plaintiff states that Defendant's failure to abide by its own policies demonstrates a lack of good faith and fair dealing with the Plaintiff with regards to his employment.  Plaintiff also asserts that it is the general public policy of the State of Arkansas to prohibit discrimination against an individual as evidenced by the passage of the Arkansas Civil Rights Act.

However, as discussed above, Plaintiff has failed to establish that he was terminated because of his disability under both the ADA and the ACRA.  Furthermore, clearly, Plaintiff was an at-will employee.  In explaining the public policy exception to the employment-at-will doctrine, the Arkansas Supreme Court stated:

> A[n] employer should not have an absolute and unfettered right to terminate an employee for an act done for the good of the public.  Therefore, we hold that an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state.  This is a limited exception to the employment-at-will doctrine.  It is not meant to protect merely private or proprietary interests.

*Palmer v. Arkansas Council on Economic Educ.*, 344 Ark. 461, 469, 40 S.W.3d 784, 788 (2001) (quoting *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988)).  The Court finds that Plaintiff has not established that the record supports the application of the public policy exception to the employment-at-will doctrine.  Therefore, summary judgment is appropriate as to Plaintiff's breach of contract claim.

19

**D.     Violation of the Family Medical Leave Act ("FMLA")**

Defendant argues that to be an eligible employee under the FMLA, an employee must have worked for a covered employer "for at least 12 months by the employer with respect to whom leave is requested" and "for at least 1,250 hours of service with such employer during the previous 12-month period. 29 U.S.C. § 2611(2)(A)(i) and (ii). Plaintiff fails to address Defendant's arguments for summary judgment as to this cause of action. The Court finds that summary judgment is appropriate as to Plaintiff's FMLA claim.

**E.     Defamation**

The following elements must be proved to support a claim of defamation: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages. *Northport Health Servs, Inc. v. Owens*, 356 Ark. 630, 641, 158 S.W.3d 164, 171 (2004).

Defendant argues that there is no evidence in the record demonstrating that the Hospital itself published any allegedly defamatory statements. Additionally, Defendant argues that Plaintiff cannot offer any evidence as to whom the allegedly defamatory statements were published. Finally, Defendant argues that Plaintiff has failed to establish damages. Plaintiff fails to respond to Defendant's arguments. The Court finds that summary judgment is appropriate as to Plaintiff's defamation claim.

### F.      Punitive Damages

Defendant argues that there is no evidence in this case demonstrating why the extraordinary measure of punitive damages should be utilized to punish the Hospital.  Plaintiff argues that he has provided enough evidence to support an award of punitive damages based upon the discriminatory actions of the Defendant in this matter.  As each of Plaintiff's claims are dismissed on summary judgment, the Court finds no basis for the award of punitive damages.

## IV.     COUNTERCLAIM

"Under 28 U.S.C. § 1367(c)(3), a court may 'decline to exercise supplemental jurisdiction over a claim ... [if] the district court has dismissed all claims over which it has original jurisdiction.'"  *Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006).  As stated above, Defendant states that if summary judgment is granted in its favor, there may no longer be federal jurisdiction.  The Court declines to exercise supplemental jurisdiction over Defendant's Counterclaim.

Accordingly,

IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment (Docket No. 25) be, and it is hereby, GRANTED.  Plaintiff's Complaint is hereby DISMISSED with prejudice.  Defendant's Counterclaim is hereby DISMISSED without prejudice.

IT IS SO ORDERED this 25th day of March, 2007.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE